Date Signed:
March 6, 2014



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>HEALTHY HUT INCORPORATED,<br><br>Debtor. | Case No. 13-00866<br>Chapter 7<br><br>Re: Docket No. 19 |

## MEMORANDUM OF DECISION ON OBJECTION TO CLAIM

This case requires me to decide the allowed amount of the claim of Historic Plantation, LLC, resulting from the debtor's breach of a commercial lease.

## Facts

The debtor, Healthy Hut Incorporated ("Healthy Hut"), and the landlord, Historic Plantation, LLC, were parties to a four-year, commercial lease, dated November 28, 2011.[1] The initial base rent was $3,465.00 per month, increasing to $3,568.95 in January 2013 and $3,676.01 in January 2014.[2] It also required the

---

[1] Dkt. 25-3.

[2] Dkt. 25-3 at 1, 16.

debtor to pay 16.9% of the common area management ("CAM") expenses.[3] The lease provided for an award of attorneys' fees in case of a breach.[4] Finally, it defined "rent" as "[a]ll monetary obligations of Lessee to Lessor under the terms of this lease" except for the security deposit.[5] The lease did not give the tenant the right to terminate the lease prior to the expiration of its stated term.

In December 2010, the landlord notified Healthy Hut that the landlord intended to treat the building for termites and offered to abate the rent for the three day period during which the building would be inaccessible.[6] Healthy Hut objected that the compensation was inadequate and that the pesticide treatment might alienate its customers.[7] The landlord cancelled the termite treatment.[8]

Beginning on October 5, 2011 and on multiple occasions thereafter, Healthy Hut told its landlord that its business was not viable and that it intended to close its shop on an unspecified date, but before the lease expired. In May 2012, Healthy

---

[3] Dkt 25-3 at 1.

[4] Dkt. 25-3 at 12-13.

[5] Dkt. 25-3 at 3.

[6] Dkt. 29 at 11.

[7] Dkt. 29 at 12.

[8] Dkt. 29 at 3.

2

Hut told the landlord that it planned to close on or around September 30, 2012.[9] Although the parties exchanged demands and proposals, the parties never reached agreement and the landlord never agreed to waive its claims for future rent or other damages against Healthy Hut.

On August 22, 2012, the landlord gave notice of its intention to conduct termite treatment of the building on October 28, 2012, a date after Healthy Hut had told the landlord it would vacate the premises.[10] Healthy Hut again objected to the termite treatment, telling the landlord that it expected to vacate the building in mid-November 2011. The landlord again delayed the termite treatment and did not perform the treatment until after Healthy Hut moved out.

On November 15, 2012, Healthy Hut left the space and sent the lessor a check for $490.70. The landlord retained Healthy Hut's security deposit. Healthy Hut intended that both be used to satisfy the November 2012 rent.

After Healthy Hut left, the landlord found a new tenant, but at a lower rent than what Healthy Hut had agreed to pay. According to the record, the new tenant only began paying rent in October 2013. Therefore, the landlord collected no rent from December 2012 - September 2013.

---

[9] Dkt. 29 at 3-4.

[10] Dkt. 29 at 4.

3

U.S. Bankruptcy Court - Hawaii    #13-00866    Dkt # 40    Filed 03/06/14    Page 3 of 12

Healthy Hut would have paid $60,039.36 in rent in the one year following the termination of the lease.[11] This amount includes the CAM charges and the base rent.

Healthy Hut filed for chapter 7 bankruptcy on May 23, 2013.

The lessor filed its proof of claim on September 13, 2013. Besides the lost rent, the lessor seeks payment for its broker's fees and attorneys' fees. The parties agree that the damages the landlord suffered because of Healthy Hut's breach exceed the amount of rent Healthy Hut would have owed in the one year following its breach.

Healthy Hut now objects to the claim.

## Standard

A proof of claim is deemed allowed unless a party in interest objects to it.[12] In order to prevail, the objecting party must "come forward with sufficient evidence and 'show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves.'"[13]

---

[11] Dkt. 25-7 at 1.

[12] 11 U.S.C. § 502(a).

[13] *Lundell v. Anchor Const. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000) (quoting *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir.1991).

4

## Discussion

The key facts are not in dispute. There was a valid lease, the terms of which are not in question. Healthy Hut vacated the leased premises in November 2012. It did not pay the remainder of the rent for the term of the lease. Finally, the parties do not dispute that the lessor had a duty to mitigate its damages, and that it found a new lessee, albeit for less than what Healthy Hut paid.

The main issues about which the parties disagree are 1) whether the lessor may assert a claim at all; 2) whether that claim is subject to section 502(b)(6)'s statutory cap on damages; and 3) the extent to which the landlord's claim is allowed.

### A.    The Validity of the Landlord's Claim

Healthy Hut argues that the landlord has no claim for two reasons.

First, Healthy Hut argues that the landlord breached the lease by giving notice of its intention to tent the building for termites. I do not agree with this argument. It is true that the landlord twice gave notice that it was going to tent the building, but both times the landlord delayed the treatment after Healthy Hut objected.  It only tented the property after Healthy Hut moved out.  There is no evidence that the notice of the intended termite treatment interfered with Healthy Hut's use of the building.  Thus, I find that the landlord did not breach the lease.

5

Healthy Hut also argues that the landlord agreed to accept the surrender of the property and that the lease was mutually terminated. I do not agree with this position either. The contemporaneous correspondence shows that the landlord never waived its right to future rent or damages. In fact, Healthy Hut stated that any proceeds from Healthy Hut's clearance sale would go to compensate the landlord for damages incurred because Healthy Hut was leaving.[14]

**B.     Statutory Cap**

The parties disagree about the maximum amount the landlord is entitled to recover. The landlord argues that it is entitled to the amount of damages that resulted from the breach, capped by section 502(b)(6), plus its attorneys' and broker's fees. In contrast, Healthy Hut argues that the landlord's entire claim is subject to the cap.

Section 502(b)(6) caps a landlord's claim "for damages resulting from the termination of a lease of real property" to any unpaid amounts owed as of the termination of the lease plus "the rent reserved by such lease" for the greater of (a) one year or (b) "15 percent, not to exceed three years, of the remaining term" of

---

[14] Dkt. 25-6 at 1.

U.S. Bankruptcy Court - Hawaii   #13-00866   Dkt # 40   Filed 03/06/14   Page 6 of 12

the lease.[15] In this case, the one year period applies. Therefore, the landlord's claim "for damages resulting from the termination" of the lease is limited to one year's rent.

Healthy Hut argues that the landlord's entire claim, including its claim for attorneys' fees and the expenses of reletting the property (primarily real estate broker's fees), is subject to the cap. The landlord argues that the cap does not apply to the landlord's attorneys' fees and reletting expenses.

The controlling case interpreting section 502(b)(6) is *El Toro*.[16] In that case, the debtor rejected a lease of property on which the debtor had left mining equipment and one million tons of mine tailings. The landlord argued that the cost of removing those items was not subject to the cap. The Ninth Circuit agreed, holding that section 502(b)(6)'s "cap applies to damages 'resulting from'" the termination of the lease. The court observed that the landlord would have had the same claim for cleanup expenses even if the debtor had assumed the lease and retained possession of the property. Thus, the claim for cleanup costs did not

---

[15] 11 U.S.C. § 502(b)(6); *see* 4-502 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 502.03[7][b] (16th ed. 2013).

[16] *Saddleback Comm. Church v. El-Toro Materials Co., Inc. (In re El-Toro Materials Co., Inc.)*, 504 F.3d 978 (9th Cir. 2007).

7

U.S. Bankruptcy Court - Hawaii  #13-00866  Dkt # 40  Filed 03/06/14  Page 7 of 12

"result from" the termination of the lease.[17]

Under *El Toro,* the landlord's claims are capped unless the landlord would have had the same claim even if Healthy Hut had not terminated the lease.

Here, all of the landlord's damages are attributable to Healthy Hut's termination of the lease. If Healthy Hut had not terminated the lease, the landlord would not have incurred the attorneys' fees or reletting expenses. Its claims for lost rental income, broker's fees, and attorneys' fees only exist because Healthy Hut breached the lease. Therefore, all of the landlord's damages are subject to the one year cap.

The landlord argues that in the interest of fairness the court should disregard the statute since the landlord is the only creditor of the estate. That is not an option. The bankruptcy court must follow the text of the Bankruptcy Code even if the result seems unfair.[18]

## C. Amount Allowed

The parties disagree on the amount of the landlord's claim. The debtor argues that the landlord should only receive $38,006.30. This amount excludes the

---

[17] *Id.* at 980.

[18] *Law v. Siegel*, No. 12-5196, 2014 WL 813702, at *5 (S. Ct. Mar. 4, 2014) ("We have long held that 'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code." (citations omitted)).

U.S. Bankruptcy Court - Hawaii    #13-00866    Dkt # 40    Filed 03/06/14    Page 8 of 12

CAM expenses and it treats the security deposit, the debtor's $490.70 payment in November 2012, and the new tenant's rent in October 2013 as credits that reduce the amount of the cap. In contrast, the landlord argues that its claim should be the capped amount of rent plus its attorneys' and broker's fees.

Section 502(b)(6) provides that a landlord may recover up to one year of "rent reserved," but it does not define that term.[19] I conclude that in this case, the "rent reserved" includes the base rent plus the CAM expenses but not the attorneys' and broker's fees.

The 9th Circuit Bankruptcy Appellate Panel has formulated a test to determine whether a charge is "rent reserved."[20] First, the charge either 1) must "be designated as 'rent' or 'additional rent'" in the lease; or 2) be the lessee's obligation in the lease.[21] Second, the charge "must be related to the value of the property or the lease."[22] Third, "the charge must be properly classifiable as rent because it is a fixed, regular or periodic charge."[23]

---

[19] 11 U.S.C. § 502(b)(6).

[20] *In re McSheridan*, 184 B.R. 91, 100 (B.A.P. 9th Cir. 1995). *El Toro* refined portions of the *McSheridan* analysis but did not disturb its definition of "rent reserved."

[21] *Id.*

[22] *Id.*

[23] *Id.*

9

1. **Base Rent and CAM Expenses**

Applying the *McSheridan* test, I conclude that the CAM expenses are "rent reserved" within the meaning of section 502(b)(6). The CAM expenses were designated as rent in the lease. Further, the CAM expenses were "related to the value of the property or the lease." Those expenses were used to maintain the common areas of the property, which the debtor was allowed to use. Finally, the CAM expenses were a "regular or periodic charge." Every month the debtor was obligated to pay its pro rata share of the CAM expenses. Thus, the CAM expenses are "rent reserved" and they should be included with the base rent in calculating the section 502(b)(6) cap.

2. **Attorneys' and Broker's Fees**

These fees are not rent under the *McSheridan* test, even though the lease defines them as rent. First, these fees are not related to the value of the property or the lease. They are related to the landlord's costs of obtaining a judgment against the debtor and finding a substitute tenant. Second, they are not a fixed, regular, or periodic charge. The amount of the fees is not fixed because it continues to rise so long as the parties continue to litigate. They are not a "regular or periodic charge" because the landlord only incurs them on an ad hoc basis. Because they fail the *McSheridan* test, the attorneys' and broker's fees are not rent reserved and they are

10

not included in the section 502(b)(6) capped amount.

**3.     Credits**

The security deposit, the $490.70 payment, and the replacement tenant's October 2013 rent should not be deducted from the cap. Instead, they should be applied to the landlord's claim for delinquent pretermination rent.

In general, when calculating the section 502(b)(6) cap, the court must deduct the amount of any security deposit in the landlord's possession.[24] In *AB Liquidating Corp.*, the landlord had a $2 million claim under section 502(b)(6) and it held $1 million in letters of credit as a security deposit.[25] The Ninth Circuit held that the bankruptcy court properly deducted the $1 million security deposit from the capped amount.

This case is distinguishable. Here, the debtor owed rent for periods prior to the termination in addition to the post-termination claims which section 502(b)(6) caps. The debtor intended to apply the security deposit and the November 2012 payment to satisfy its obligation for the November 2012 rent. Because this exhausted the security deposit, there is no security deposit remaining to apply to

---

[24] *In re AB Liquidating Corp.*, 416 F.3d 961, 963-64 (9th Cir. 2005).

[25] *Id.* at 963.

11

the post-termination claim.

Similarly, the replacement tenant's rent should not be deducted from the capped amount. In calculating the landlord's capped claim, the court must 1) determine the landlord's gross damages after subtracting any amounts recouped through mitigation; 2) compare the gross damages to the 502(b)(6) cap; 3) subtract any security deposit from the capped amount; and 4) allow a claim in that amount.[26]

Here, the small amount the landlord recouped by reletting the property would be subtracted from the total amount of damages that the debtor's breach caused under the first step in the *AB Liquidating* methodology. But since that small amount would not bring the landlord's claim below the cap, it is immaterial.

The landlord's claim is ALLOWED in the amount of $60,039.36. Counsel for the landlord shall submit a proposed form of final order.

**END OF MEMORANDUM**

---

[26] *In re AB Liquidating Corp.*, 416 F.3d at 963-64 (endorsing the methodology the courts below applied).

U.S. Bankruptcy Court - Hawaii   #13-00866   Dkt # 40   Filed  03/06/14   Page 12 of 12